IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff*, ) | No. 13 CR 949 |
| V. ) | |
| ) | Hon. Virginia M. Kendall |
| MARVIN T. BELL, MONICA ) | |
| HERNANDEZ, and CARLOS RAYAS, ) | |
| ) | |
| *Defendants*. ) | |

**MEMORANDUM OPINION AND ORDER**

On December 11, 2013, a grand jury indicted Defendants Melvin Bell and Monica Hernandez on four counts of mail fraud (Counts I–IV) and Defendant Carlos Rayas on two counts of mail fraud (Counts I and IV) all in violation of 18 U.S.C. § 1341. (Dkt. 2). On January 20, 2017, Defendant Rayas pled guilty to Count IV. (Dkts. 336–37). On February 1, 2017, a jury found Defendants Bell and Hernandez each guilty on three counts of mail fraud. (Dkts. 350–353). Defendant Hernandez filed a Motion for Judgment of Acquittal Or, In the Alternative, New Trial on all three counts, pursuant to Federal Rules of Criminal Procedure 29 and 33. (Dkt. 359). For the following reasons, Defendant Hernandez's Motion (Dkt. 359) is denied.

**BACKGROUND**

The Indictment alleged that Bell, Hernandez and Rayas ("Defendants") participated in a scheme beginning in October 2011 and continuing through 2013 wherein they falsely marketed Washington National Trust as a trust operated and controlled by wealthy Native Americans who provided financial assistance to homeowners facing foreclosure of their homes. (*Id.* at ¶¶ 3–4).

1

Specifically, the Government charged that Defendants falsely represented to homeowners that in exchange for fees ranging from $5,000 to $10,000, WNT would lower their mortgages and/or defeat foreclosure by purchasing their mortgages from the lender, applying the fees paid to WNT by the homeowners to the principal balance, and then charging the homeowners only half of their original mortgage to be paid over five years free of any interest and taxes. (*Id.* at ¶¶ 6–8). The Indictment further alleged that Defendants directed homeowners to sign documents and deeds purportedly transferring title to WNT and assigning WNT as their trustee and then mailed the new members signed copies of these membership documents knowing the documents would have no effect on the foreclosure process and were designed only to make WNT appear legitimate. (*Id.* at ¶¶ 9–10). In fact, WNT did not have sufficient funds to purchase any homeowner's mortgage and never did so, instead using used the homeowners' fees for personal expenses, WNT operations, and referral fees paid to individuals who referred additional homeowners to WNT. (*Id.* at ¶¶ 13–15). Defendants concealed all of this from homeowners, as well as the fact that in December 2012 the Illinois Department of Financial and Professional Regulation (IDFPR) ordered WNT to cease and desist using the work "trust" when conducting business in Illinois and in February 2013 revoked Rayas' mortgage loan originator license and ordered Bell and Hernandez to cease and desist engaging in unlawful residential mortgage origination activity in Illinois. (*Id.* at ¶¶ 18–21).

Each of the four counts charged in the Indictment corresponds to a separate mailing of membership documents, alleging that on a specific date—April 11, 2012, August 8, 2012, September 6, 2012, and September 7, 2012—Defendants:

> for purpose of executing the scheme to defraud, knowingly caused to be delivered by U.S. mail, according to the direction thereon, an envelope

> containing signed copies of membership documents from WNT to [a member in Illinois].

*(Id.* at Counts I-IV). The four individual victims were later identified as Rafael Ramirez, Cuahtemoc Lopez, Adan Tapia and Blanca Gonzalez. The Government eventually dropped the charge based on the mailing to Tapia. On January 20, 2017, Rayas pled guilty to one of the charges of mail fraud against him. (Dkt. 337).

The Court held a jury trial from January 25, 2017 to February 1, 2017 on the remaining three charges against Bell and Hernandez. The jury heard from several witnesses including Ramirez, Lopez, Tapia, Gonzalez and other victims of Defendants' scheme; WNT employees; the IDFPR employee who handled the investigation into WNT; and the auditor with the U.S. Attorney's Office who investigated WNT's finances. The Government also introduced a number of exhibits including the membership packets mailed to Ramirez, Lopez and Gonzalez; more than 60 folders of WNT records including outgoing mail maintained by Hernandez; and WNT financial records.

The jury judged the credibility of the witnesses, weighed the evidence and found Bell and Hernandez guilty on three counts of mail fraud. Hernandez claims the jury was wrong and the Government did not meet its burden of proof on any of the three charges. She also argues the Court erred in admitting improper propensity evidence and in allowing the Government to make impermissible arguments during closing arguments.

## **LEGAL STANDARD**

Federal Rule of Criminal Procedure 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "In challenging the sufficiency of the evidence, [the defendant] bears a heavy, indeed, nearly

insurmountable, burden." *United States v. Warren,* 593 F.3d 540, 546 (7th Cir. 2010). The defendant "must convince [the court] that even after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found h[er] guilty beyond a reasonable doubt." *Id.* (quoting *United States v. Woods*, 556 F.3d 616, 621 (7th Cir. 2009)). In other words, a court will "set aside a jury's guilty verdict only if the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction." *United States v. Presbitero,* 569 F.3d 691, 704 (7th Cir. 2009); *see also United States v. Chhibber*, 741 F.3d 852, 858 (7th Cir. 2014) (The Court "will overturn a verdict for insufficiency of the evidence only if, after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a rational trier of fact could find guilt beyond a reasonable doubt."). The jury must weigh the evidence and assess the witnesses' credibility and courts do not "second-guess the jury's assessment of the evidence." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008); *see also Warren,* 593 F.3d at 547 ("Sorting the facts and inferences is a task for the jury."). If "there is a reasonable basis in the record for the verdict, it must stand." *United States v. Moshiri*, 858 F.3d 1077, 1082 (7th Cir. 2017).

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Unlike a motion for judgment of acquittal, the Court need not view the evidence in the light most favorable to the Government and may properly consider the credibility of the witnesses. *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). The Court may grant a new trial under Rule 33 "if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice" (*id.*) or

"if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Eberhart,* 388 F.3d 1043, 1048 (7th Cir. 2004), *overruled on other grounds*, 546 U.S. 12 (2005)). The Court may *not* reweigh evidence and set aside a verdict because it thinks that another finding would have been more reasonable. *See United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *Eberhardt*, 388 F.3d at 1048 (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir.1994)). Accordingly, Rule 33 motions are generally disfavored and "courts are to grant them sparingly and with caution, doing so only in really exceptional cases." *Reed*, 875 F.2d at 113 (citation omitted).

## DISCUSSION

Hernandez argues that the Court should enter a judgment of acquittal pursuant to Rule 29 for each count because the Government failed to meet its burden of proving her guilty beyond a reasonable doubt and, in the alternative, to grant a new trial pursuant to Rule 33 because the weight of the evidence on the mail fraud counts is heavily against verdict entered. Hernandez also moves for a new trial under Rule 33 on the grounds that the Court erred in permitting the Government to introduce "highly prejudicial" propensity evidence at trial and to make impermissible arguments about that evidence during its rebuttal argument at the close of trial. (Dkt. 359). Hernandez is not entitled to any of the relief sought.

**I.      Ample Evidence in the Record Supports the Jury's Verdict.**

The jury found Hernandez guilty of three counts of mail fraud under 18 U.S.C. § 1341. To sustain a mail fraud conviction under 18 U.S.C. § 1341, the government must prove three elements: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme. *See United States v. Jackson*, 546 F.3d 801, 810 (7th Cir. 2008); *United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir. 1993). Hernandez argues the Government failed to introduce sufficient evidence at trial to prove the third element—that the use of mails furthered the scheme—beyond a reasonable doubt.

The mail fraud statute is not intended to reach all frauds but only those in which the use of the mails is part of the scheme. *See United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008)[1] (citing *Schmuck v. United States*, 489 U.S. 705, 710 (1989)). The use of the mail "need not be an indispensable part of the fraud to satisfy the 'in furtherance of' element of the offense; it need only 'be incident to an essential part of the scheme . . . or a step in [the] plot.'" *Id.* (quoting *Schmuck*, 489 U.S. at 710–11)). "In other words, the success of the scheme must in some measure depend on the mailing." *Id.* (citing *United States v. Seward*, 272 F.3d 831, 836 (7th Cir.2001)). Additionally, the defendant need not have personally caused the use of the mail; "it is enough that the use of mail . . . 'will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" *Id.* (quoting *Pereira v. United States*, 347 U.S. 1, 8–9

---

[1] *Turner* dealt with both the mail fraud and wire fraud statutes. These statutes—18 U.S.C. § 1341 and § 1341, respectively—are worded almost identically. Therefore, "[c]ases construing the mail-fraud statute are equally applicable to cases involving violations of the wire-fraud statute," and vice versa. *Turner*, 551 F.3d at 666, n.4 (citing *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006)); *see also* United States v. Dooley, 578 F.3d 582, 587, n.2 (7th Cir. 2009).

(1954)). Finally, the mailing "need not itself contain false or fraudulent material"; a "routine or innocent" mailing can satisfy the third element of the offense so long as it "is part of the execution of the scheme." *Id.* (citations omitted).

Hernandez argues the Government introduced "no evidence" to show the three mailings underlying her three mail fraud convictions furthered, carried out, or were incident to an essential part of the fraud. Hernandez makes much of the fact that the victims of the scheme each testified that his or her deal with WNT was completed upon signing the membership documents. (*See* Dkt. 359 at 10 ("Each person testified unequivocally that their deal with WNT was done when they signed their agreements in person.")). Indeed, Ramirez, Lopez and Tapia each testified that they understood their deal with WNT to be complete upon signing an agreement at WNT's office. (*See, e.g.,* Dkt. 409 at 769:18–21 (Defense counsel: "But at the time that you signed the documents in person at Washington National Trust, your agreement with Washington National Trust was complete, correct?" Ramirez: "As I understood it.")). But the members' understanding of the scheme is just one piece of evidence presented to the jury and, regardless, is by no means dispositive of whether the "in furtherance" element was met for purposes of the mail fraud statute.

The mailings must be examined within the context of the scheme. *See United States v. Draiman*, 784 F.2d 248, 252 (7th Cir. 1986). Here, the scheme did not end when the members signed the membership documents at WNT. The goal of the scheme was to obtain money from WNT member and the members did not make full payment of the fees owed to WNT at the time they signed the membership documents. Rather, each victim who testified at trial explained that WNT charged him or her a $125 application fee at the time the agreement was signed plus a fee in the range of $5,000 to $10,000 depending on the

balance left on the mortgage to be paid over time, *after the documents were signed*, according to an agreed-upon payment plan. *See United States v. Powell*, 576 F.3d 482, 494 (7th Cir. 2009) ("As the object of the scheme to defraud the Historical Society was the money, the actual receipt of the funds into Harris's trust account was an essential part of the scheme."); *Seward*, 272 F.3d at 836 (because scheme was not limited to initial withdrawals of money from victim's account, the jury could have found that the mailing sent seven months after such withdrawals and seeking to defraud victim's estate of any remaining assets through a forged will was made "in furtherance of the scheme").

For example, Ramirez testified that WNT charged him $125 membership fee plus $7,500 based on the balance of his mortgage, that at the time he signed the agreement with WNT he paid only what he was able (approximately $1,000), that he agreed to make subsequent payments according to a payment plan as WNT began working on his behalf, and that he thereafter worked extra hours at his second job and skipped payments on other bills in order to pay WNT according to that payment plan. (Dkt. 409 at 674:6–675:22; 691:14–22; 709:4–5). Similarly, Gonzalez testified that WNT charged her $125 plus $5,000 in fees, that she was only able to pay the $125 and half of the $5,000 fee at the time she signed the membership paperwork in September 2012, and that she paid the remaining $2,500 in several additional payments over the next five months: $500 on October 10, 2012, $300 on November 8, 2012, $900 on February 1, 2013, and $1,200 on February 8, 2013. (*Id.* at 1036:13–1037:1; 1040:17–1041:6; 1045:9–18; 1046:14–20; 1047:5–12); *see also, e.g., id.* at 941:16–942:23 (Lopez agreed to pay $5,000 fee in two payments, one-half at the time he became a member and the remainder at a later date); *id.* at 1015:17–23 (Tapia paid $125 at the time he became a member and $7,500 in two later payments).

The evidence showed also that WNT continued to rely on its members *after* they signed the initial agreement because, as part of the scheme, WNT offered to pay members to refer friends and/or family to WNT for foreclosure assistance. (*See id.* at 709: 6–11; 879:3–7). Additionally, WNT told each member that it would take three to four months *after* signing the agreement to complete the process of purchasing and restructuring the new loan and, if WNT failed to acquire the mortgage within that time frame, he or she would receive a refund. (*See, e.g., id*. at 706: 9–13; 834:11–14; 948:20–25; 1016:3–7). WNT then kept in contact with and reassured members that it was working on their cases for months after the membership documents were signed. (*See, e.g., id.* at 7949:3–13 (Government: "And, in total, how many more times did you meet with her in person after you became a member?" Lopez: "About two, three, I think, afterwards." Government: "And during those meetings, did you ask Ms. Hernandez or notify her that your bank was threatening to foreclose on your shop?" Lopez: "Yes, I commented that to her. I even took her one of the letters. . . She said not to worry, that they were already working with the original bank as to that situation."); *id.* at 1019:15–1020:4 (Government: "And when you spoke to Ms. Hernandez on the phone, did you tell her what was happening with your property?" Tapia: "Yes . . . [She said] that it was in process of being worked on, that her company was doing what was possible to stop.")).

Therefore, there was ample evidence for the jury to find the scheme was by no means over before the mailings were sent, when a member signed the membership documents and paid the initial application fee. At any point thereafter, a member could stop making payments to WNT, stop referring new members, warn potential new members not to work with WNT, or demand a refund. A reasonable jury could find that the success

of the scheme depended on WNT continuing a good relationship with its members and avoiding detection for as long as possible and that the mailings contributed to this goal. *See Schmuck*, 489 U.S. at 711–12 ("Thus, Schmuck's was not a 'one-shot' operation . . . [but] an ongoing fraudulent venture. A rational jury could have concluded that the success of [the] venture depended upon his continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers.").

It does not matter, as Hernandez would argue, that no victim explicitly testified that he would not have continued to make payments to WNT if the membership package had not been mailed to him. The mailing need only be incident—not indispensable—to the scheme and, regardless, such direct evidence is never required. *See United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000) ("[I]t is well established that a jury's verdict may rest solely upon circumstantial evidence.") (quoting *United States v.* Robinson, 177 F.3d 643, 648 (7th Cir. 1999)). Here, a rational jury could find that the mailings were incident to or a step in this scheme.

Hernandez argues also that the mailings are insufficient because they were merely part of an after-the-fact transaction, relying primarily on *United States v. Maze*, 414 U.S. 395 (1974) and *United States v. Kwiat*, 817 F.2d 440 (7th Cir. 1987). Both *Maze* and *Kwiat* are distinguishable.

In *Maze*, the defendant stole his roommate's credit card and used it to pay for food and lodging on a trip to California, Florida and Louisiana. 414 U.S. at 396. He was convicted of four counts of mail fraud based on the invoices sent by the motels where he used the card through the mail to his roommate's bank in Louisville, Kentucky. *Id.* at 396–

97. The Supreme Court held that such mailings were not "for the purpose of executing the scheme" because by the time the mailings occurred, the scheme had reached fruition and it was immaterial to the defendant how the motel collected its payment: "Respondent's scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." *Id.* at 402.

Here, unlike in *Maze* and as described above, the scheme had not reached fruition by the time the membership packages were mailed. Here, the mailings were made *before* WNT obtained the victims' full payments and *while* WNT continued to reassure victims that it was working on their behalf and making progress. For example, as the Government highlighted in its closing argument (*see* Dkt. 409 at 1544:14–1546:13), the evidence showed that WNT mailed Gonzales the membership packet on September 7, 2012—after she made her initial $2,500 payment but before she paid off the remaining $2,500 over the next five months as WNT continued to reassure her that it would come through on its promise. *See* Govt. Exh. B, Gonzalez 1 (packet mailed to Gonzalez on September 7, 2012); Dkt. 409 at 1040:17–1041:6 ("Government: "And did you receive this after you had made the $2,500 payment to Mr. Rayas?" Gonzalez: "Yes."); *id.* at 1048:1–6 (Government: "Now, why did you continue making payments to Washington National Trust through February of 2013 if they had not . . .bought your mortgage and cut your payments in half?" Gonzalez: "Well, Mr. Rayas said that they were working on my case and that they were dealing with the bank.")).

Indeed, in *Maze*, the Supreme Court acknowledged that mailings "designed to lull the victims into a false sense of security, postpone their ultimate complaint to authorities,

11

and therefore make the apprehension of the defendants less likely than if no mailings had taken place" could support a mail fraud conviction. 414 U.S. at 403. There, the Supreme Court ultimately found that the mailings actually "increased the probability that [defendant] would be detected and apprehended" and that only distance, not the mailings, provided any beneficial delay to defendant's detection. *Id.* Here, to the contrary, there was ample evidence to support a finding that the mailings were not merely after-the-fact transactions but were "part and parcel" with the scheme, helping WNT to postpone members' complaints and make detection less likely than if no mailings had taken place, as members continued to pay and refer potential new victims to the scheme.

In *Kwiat*, the defendants were convicted of mail fraud for perpetrating a scheme to defraud a bank's depositors and stockholders of honest services by collecting commissions on improper real estate loans that the bank ultimately could not recoup. 817 F.2d at 442. Defendants were convicted of mail fraud based on the mortgaged instruments that were mailed by the recorder of deeds to the bank after each deed was recorded. *Id.* at 443. The Seventh Circuit held that these mailings "did not make the fraud possible or facilitate it" and were unrelated to the scheme because they did not "help [defendants] rake in money from the Bank," "reduce the quality of intangible services [defendants] supplied to the Bank," or "help [defendants] hide their delicts or postpone their day of reckoning." *Id.* at 443. Again, the mailings here are distinguishable because a reasonable juror could find that mailing the membership packets facilitated the fraud by perpetuating WNT's appearance of legitimacy and delaying detection of the fraud so members would continue to make payments and refer friends—*i.e.*, helping defendants both "rake in money" and "postpone their day of reckoning." *See United States v. Fernandez*, 282 F.3d 500, 508 (7th

Cir. 2002) (mailings were "in furtherance of" the contract-bidding scheme to defraud the village by "falsely portraying the legitimacy" of the bids submitted in order to collect payment from the village).

Hernandez next argues that "the jurors heard nothing about [WNT]'s mailing practices or what [Hernandez] knew regarding whether or not WNT membership packets were to be sent to members days or weeks after they joined." (Dkt. 359 at 8). This argument ignores entirely (1) The more than 60 folders of records maintained by Hernandez including mailings and receipts of mailings sent by WNT to victims and banks that were introduced by the Government at trial, *see* Govt. Exh. Washington National Trust; Stipulation No. 10 ("Government Exhibit Washington National Trust, which is a group exhibit consisting of approximately 67 folders, are records maintained by Defendant Monica Hernandez.")[2] and (2) testimony by WNT employee Malanie Moreno that WNT's practice after a new member signed an agreement was to create a new file, process the file, and then mail a copy to the client. (Dkt. 409 at 861:25–862:9). The jury could have easily found from this evidence that Hernandez, who not only co-founded WNT but worked directly with members at WNT's office every day, knew the membership documents would

---

[2] Hernandez claims the Government cannot rely on these non-charged mailings to prove the knowledge element, noting the Government dismissed the fourth charge against Defendants because it could not prove Tapia ever received the membership packet in the mail and, therefore, "could not prove that the specific mailing furthered any scheme if Tapia never received it in the mail." (Dkt. 359 at 3). The difference here, of course, is that the Government relied on the non-charged mailings as proof of the knowledge element—*i.e.*, that Hernandez knew WNT used the mail in the ordinary course of business—and not to show that any specific mailing underlying the three charges against Hernandez was made. In fact, the Government sufficiently established that Ramirez, Lopez and Gonzalez received a membership packet in the mail through each victim's own testimony. There was nothing improper in the Government relying on the non-charged mailings as circumstantial evidence that Hernandez foresaw those mailings being made.

be sent in the ordinary course of business to new members like Ramirez, Lopez and Gonzalez after they signed the paperwork in person.

Because there is ample evidence to support the jury's verdict, Hernandez is not entitled to a new trial under Rule 33 or, for that matter, to a judgment of acquittal under Rule 29.

**II.     The Alleged Trial Errors Do Not Justify A New Trial.**

Hernandez argues she is entitled to a new trial under Rule 33 because the Court erred in permitting the Government to introduce evidence during its rebuttal argument that was "highly prejudicial" and should have been excluded. Specifically, during its rebuttal argument at the close of trial, the Government summarized all the evidence showing Defendants knowingly lied to their victims when they told them WNT would purchase their mortgages. (*See* Dkt. 409 at 1630:1–1637:20). As part of this presentation, the Government walked through various bank records admitted as evidence of the true financial condition of WNT:

> So let's get started. . . . [T]here was a lot of evidence of in the form of the bank records [as to] what the defendants' financial condition was at the time that they set up this company that they pretended was a bank or a financial institution backed by millions of dollars from a Native American organization.
>
> So let's take a look at what the defendants' financial condition was in 2011 when they started Washington National Trust based on the actual evidence that was admitted at trial.
>
> Government Exhibit Chase 3 shows that in March of 2011, King Bey, Trustee, opened a bank account at Chase in the name of Global Trust Securities.
>
> . . .
>
> [B]y 2011, they have no less than six different bank accounts that they've set up, even before the first victim even walks into Washington National Trust.

> . . .
>
> [In] February of 2012, [the bank] sent the response for request to payoff to [WNT member] Mr. Sanchez, and they specifically indicate what the method of payment had to be regarding certified check and the amount due on the mortgage, hundreds of -- over 100,000 -- $187,000. Mind you, at this point, Washington National Trust doesn't even have a bank account. They're still using these Global Trust Securities accounts.
>
> On February 22nd of 2012, less than a week after . . . [the bank] sends information saying the amount due on the mortgage and the method of payment, this is Government Exhibit Chase 3 and the subject of a stipulation, this mysterious $100,000 check from the supposed Melvin Bell Trust -- which, by the way, was not issued by Treasury Direct, that's what the stipulation says -- someone tries to cash this for King Bey into a Global Trust Securities account.
>
> That's not a coincidence, Ladies and Gentlemen. They got the message. They needed money to actually deliver on the things that they had started promising to Mr. Sanchez and others. But all you have is a phony check and no money.
>
> So what starts to happen next? . . . [T]hat's when they open up the bank accounts for the first time in the name of Washington National Trust. . . . And you saw . . . that some of the first money that went into the account were checks from the victims, checks for $5,125. There was no money from any trusts, any banks, any Native American organizations that was funding this company.
>
> . . .
>
> Just to summarize, Ladies and Gentlemen, they never had the money to pay for a single mortgage, and they knew it. As the money came in, they spent it. They tried opening additional accounts. Nothing came in there either.

(*See* Dkt. 409 at 1630:1–1637:20).

The "mysterious $100,000 check" in Government Chase Exhibit 3 was a $100,000 check issued by Melvin Bell Trust to "King Bey or Global Securities Trust" and purporting to be drawn on a Department of Treasury account that was placed into a Chase ATM for deposit in an account belonging to Global Securities Trust on February 22, 2012. (*See* Govt. Exh. Chase 3; *see also* Dkt. 338 at 1). The exhibit showed that Chase rejected the

15

attempt to deposit the check. Hernandez argues the check should have been excluded as improper propensity evidence under Federal Rule of Evidence 404(b) because the only purpose of admitting it was for the Government to argue that Defendant Bell tried to defraud banks with "phony" checks and, therefore, tried to defraud members of WNT. (Dkt. 359 at 11).

"Under Rule 404(b), relevant evidence of a crime, wrong, or other act is inadmissible if the proponent offers the evidence to show a person's propensity to act a certain way." *United States v. Ferrell*, 816 F.3d 433, 442 (7th Cir. 2015) (citing Fed. R. Evid. 404(b)). However, the Court "may admit other-act evidence if the evidence is offered for 'another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" *Id.* at 442–43 (quoting Fed. R. Evid. 404(b)(2)). Hernandez misrepresents how the evidence was admitted. It was not admitted as other act evidence but of direct evidence of the crimes charged and "Rule 404(b) does not apply to direct evidence of the crime charged." *Id.*

The $100,000 check was clearly offered as direct evidence of the crime charged—specifically, as proof that Defendants did not have the funds they represented to potential WNT members that they had. At trial, several victims testified that Defendants told them WNT was owned by Native American millionaires or billionaires who wanted to use their funds to help people in foreclosure. (*See, e.g.,* Dkt. 409 at 848:14–16 ("[Hernandez] said that . . . it was owned by Native American Indians that were billionaires, and they were helping people from foreclosure save their houses."); *id.* at 1008:6–15 (Government: "What did [Hernandez] tell you about the work that Washington National Trust did?" Tapia: "[S]he said that I had come to the right place, not to worry anymore, that it would

16

all get resolved, that this company had lots and lots of money, millions, billions, and that they didn't know what to do with it. . . . [T]hey were going to support us and help us to recover the property" with those millions and billions.). They testified further that the fact that WNT had so much money in the bank was critical to their decision to join as a member. (*See, e.g.,* Dkt. 409 at 1015:3–7 (Government: "At the time you were filling this paperwork out, was there anything that Ms. Hernandez said to you that made you trust her?" Tapia: "What started from the very beginning, about the millionaires that were helping out."); *id.* at 1232:4–11 (Government: "When Monica Hernandez represented to you that Washington National Trust had [$]2 to $4 million in the bank, was that important to you in [] making your decision to sign up?" Alansi: "Yes.")). The Government explicitly offered the check, along with other bank records, to the jury as evidence "defendants' financial condition [] at the time that they set up this company" and argued the rejected check showed that defendants needed money but in fact had none. This is direct evidence that "the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise"— an element of the crime charged which, as the Court instructed the jury, the Government had the burden to prove. (*See* Dkt. 409 at 1653:15–1654:12).

Even if one were to consider this evidence as other-act evidence, which the Court already clarified that it was not, the check was properly admitted under Federal Rule of Evidence 403. Even if other-act evidence is direct evidence of the crime charged, the Court may exclude it under Rule 403 if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Ferrell*, 816 F.3d at 443.

Here, the Rule 403 balancing test weighs in favor of admissibility. The check was highly relevant to the financial strength of the company and, therefore, the falsity of Defendants' material representations to WNT members. Hernandez argues the Government's characterization of the check as "phony" was improper and unfairly prejudicial because it suggested in a mail fraud case that one of the Defendants had previously committed a different fraud. (Dkt. 359 at 13). As an initial matter, Defendants already conceded by way of stipulation at trial that the check was not what it purported to be:

> Government Exhibit Chase 3, page 67, which appears to be a check written from a Treasury Direct account affiliated with the United States Department of the Treasury, is not a Treasury Direct check and was never drawn on a Treasury Direct.

(*See* Dkt. 409: 1517:22–1518:2). Calling the check "phony" merely restated what was already made clear in the stipulation: the check was fake. In fact, the Government explicitly referenced the stipulation in its rebuttal argument. (*See id.* at 1634:16–1635:2). Importantly, the Government *never* suggested that Bell, or Hernandez for that matter, forged or created the fake check or was the one to deposit the fake check, instead arguing only that "someone trie[d] to cash this for King Bey into a Global Trust Securities account." (*Id.* at 1624:22–23). The *only* inference the Government asked the jury to make was that Defendants had no money to purchase mortgages as they had promised: "They never had the money to pay for a single mortgage, and they knew it." (*Id.* at 1637:17–18). Any potential prejudicial effect did not substantially outweigh the check's probative value here.

Therefore, Hernandez is not entitled to a new trial under Rule 33 because the check was highly relevant, direct evidence of the crime charged and neither the check nor the Government's rebuttal argument unduly prejudiced Hernandez.

## **CONCLUSION**

For the reasons stated above, Defendant Hernandez's Motion for Judgment of Acquittal Or, In the Alternative, New Trial (Dkt. 359) is denied.

Hon. Virginia M. Kendall
United States District Judge

Date: January 30, 2019